2022 IL App (1st) 200833-U
No. 1-20-0833

FIRST DIVISION
March 7, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| BRIAN C. WARNER, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19 CH 03954 |
| | ) | |
| THE RETIREMENT BOARD OF THE | ) | |
| POLICEMEN'S ANNUITY AND BENEFIT | ) | The Honorable |
| FUND OF THE CITY OF CHICAGO, | ) | Caroline K. Moreland, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | | |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Walker and Coghlan concur in the judgment.

**ORDER**

¶ 1    *Held*: The decision of the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago that plaintiff, a former police officer, was not entitled to line-of-duty disability benefits, was clearly erroneous.

¶ 2    In this administrative review action, Defendant Retirement Board of the Policeman's Annuity and Benefit Fund of the City of Chicago ("the Board") appeals the circuit court order reversing the Board's decision to deny the continuation of a line-of-duty disability pension by plaintiff Brian Warner, and instead, award him an ordinary disability pension. For the following reasons, we agree

that the Board's decision that plaintiff ceased to be disabled from PTSD but continued to be disabled from his anger and animosity towards the CPD, was not manifestly erroneous. Further, we agree that the Board's finding that plaintiff was entitled to an ordinary pension and not a line-of-duty pension was clearly erroneous. Thus, we affirm the judgment of the circuit court of Cook County.

¶ 3                                                    BACKGROUND

¶ 4        The following facts have been adduced from the testimony presented at the administrative review hearing and accompanying exhibits: Plaintiff, Brian Warner, was a police officer employed by the Chicago Police Department beginning in 1994. Plaintiff subsequently filed an application for a line-of-duty disability pension because of an act of duty incident that occurred on February 23, 2011. On that date, plaintiff was shot and wounded while transporting an arrestee, after which, he returned fire and killed the arrestee. On June 27, 2013, the Board found that, while in the performance of an act of duty incident, plaintiff sustained an injury, which was diagnosed as Post-Traumatic Stress Disorder ("PTSD") and awarded him a line-of-duty disability pension. A line-of-duty disability pension entitles a police officer a disability pension "equal to 75% of his salary, as salary is defined in this Article…" 40 ILCS 5/5-154 (West 2001). Alternatively, an ordinary disability pension entitles a police officer to 50% of his or her salary. 40 ILCS 5/5-155 (West 2016). Plaintiff continued to receive a line-of-duty pension from 2013 until 2018.

¶ 5        In 2018, as provided in section 5-156 of the Illinois Pension Code, the Board initiated its annual review of plaintiff's disability benefit and requested that plaintiff be examined by one or more physicians appointed by the Board. 40 ILCS 5/5-156 (West 1998) ("…A disabled policeman who receives a duty, occupational disease, or ordinary disability benefit shall be examined at least once

a year by one or more physicians appointed by the board. When the disability ceases, the board shall discontinue payment of the benefit, and the policeman shall be returned to active service.")

¶ 6        Beginning in September of 2018, the Board conducted the status review hearing to determine if plaintiff remained disabled and unable to return to CPD service, and, if disabled, the cause thereof, to determine whether plaintiff should continue to receive line-of-duty disability or should receive an ordinary disability. At the conclusion of the administrative hearing, the Board determined that plaintiff was no longer disabled from PTSD, the condition for which the Board initially granted him a line-of-duty disability benefit, but remained disabled and "currently unable to return to service with the CPD because of his deep-seeded and continuing anger with the CPD as to the manner in which they handle situations involving mental disabilities suffered by police officers[.]" Therefore, the Board determined that plaintiff should receive an ordinary disability pension and no longer receive a line-of-duty disability pension.

¶ 7        Plaintiff sought administrative review with the circuit court. The circuit court reversed the Board's decision to discontinue line-of-duty pension benefits and to award plaintiff ordinary disability pension benefits. Specifically, the circuit court upheld the Board's determination that plaintiff's disability for PTSD had ceased, and that plaintiff continued to be disabled because of the anger he felt towards the CPD. The circuit court, however, further found that the Board's decision to reduce his pension from a line-of-duty disability pension to an ordinary disability pension was clearly erroneous where there was evidence showing that his disability was causally related to the prior act of duty injury. The circuit court ordered that plaintiff's line-of-duty disability pension should be reinstated retroactively to February 28, 2018.

¶ 8        The Board maintains that its decision should be upheld where there was evidence that plaintiff's disability for PTSD had ceased, that plaintiff continued to be disabled because of the

anger he felt towards the CPD, and that his current disability is not causally related to the act-of-duty incident, resulting in the awarding of an ordinary disability pension and not a line-of-duty disability pension. Plaintiff argues that the Board erred in finding that he had ceased to be disabled from PTSD. Plaintiff also argues that the Board erred in finding that his current disability was not causally related to the act-of-duty shooting incident.

¶ 9     At the administrative review hearing, the parties presented the testimony of plaintiff, Doctor Nancy Landre, and Doctor Stevan Hobfall[1]. The parties also provided plaintiff's medical records relating to the treatment he received, including medical reports of Doctor Landre, Doctor Hobfall, and Doctor Robin Kroll.

¶ 10                           Brian Warner

¶ 11     Plaintiff testified that he began working as a Chicago police officer on October 3, 1994. On June 27, 2013, the Pension Board awarded him a line-of-duty disability benefit of 75% and at the time of the hearing, he was still receiving that benefit. At the time of the hearing, he worked as a driver with the Teamsters; assigned to various movie and television production sets. He does not carry a gun for his job, but he has a Firearm Owner's Identification ("FOID") card and owns a gun. He volunteers and is chairperson for the Chicago Survivors Group, a group dedicated to obtaining resources for police officers who go through traumatic experiences. He has spoken about this group on television, including various television talk shows. He has spoken about the impact that shootings have on a police officer, the lack of available resources for these officers, and he advocates for more resources.

¶ 12     Plaintiff was asked if there was anything that would prevent him from going back to work with the CPD in a job doing clerical work. Plaintiff testified that this type of job is not available with

_____

[1] Hopfoll's first name is misspelled at various times in the record as Steven and Stephen.

the CPD for those returning from disability. After he researched this topic and found that some police departments allow for such a light-duty return from disability, he previously asked the CPD to make such a position available for him, but his request was rejected.

¶ 13     Plaintiff testified, "What prevents me from going back to work? It's because I don't know how I'm going to act, overreact or under-react if I'm put in a stressful situation. As a police officer, if you had the ability to bring me back and [retrain] me, how am I going to react? I don't know." He also testified that he does not believe that he can fire a gun. He explained that the last time that he fired a gun was approximately eight months after the shooting when he and his partner went to a shooting range to meet state qualifications. Plaintiff panicked when his partner fired a weapon, and plaintiff fired a shot that hit the wall.

¶ 14     At the hearing, plaintiff was asked to explain the medical treatment he received. He testified that he had seen several doctors since he was injured. He saw Doctor Tudor one time on April 24, 2013. He saw Doctor Robin Kroll three to four times over a six-month period, including February 28, 2013. He was also treated by Doctor Stevan Hobfoll. The first time that he saw Doctor Hobfoll was seven to eight months after he was injured, and before he was granted line-of-duty disability. At one point, he was being treated by both Doctor Hobfoll and by Doctor Kroll, but he was told that he would have to choose between these two doctors as their treatment services overlapped. He chose to continue treatment with Doctor Kroll. When Doctor Kroll was subsequently removed from the approved provider list, he was treated by Doctor Hobfoll. Plaintiff testified that, since the incident, the longest he has gone without seeing a therapist is a month.

¶ 15                                   Doctor Nancy Landre

¶ 16     Doctor Nancy Landre testified that she is an independent medical expert hired by the Board to evaluate plaintiff relating to his duty disability. She never treated plaintiff. She previously

examined him on November 3, 2016, and again on January 24, 2018. The examinations consisted of a review of medical records, administering a series of psychological tests, and interviews with plaintiff. She issued written reports on both occasions relating to her evaluations. In her written report from 2016, her evaluation revealed findings of "PTSD, in Partial Remission" as well as a possible Alcohol Use Disorder. In her 2016 report, she stated that "[Plaintiff] no longer meets full criteria for PTSD, but is experiencing some residual symptoms of the disorder." She opined that plaintiff was incapable of resuming duty at that time "[b]ecause of his emotional volatility and intense anger towards the Department…[,]" but that he might be capable of doing so in the future with proper treatment." She also opined that the disabling injury was related to the previous incident.

¶ 17    On January 24, 2018, she evaluated plaintiff for a second time. In her written report, she stated that plaintiff continued to work full time as a Teamster and had become engaged to his fiancé. At the time of the interview, plaintiff was asked to explain any current complaints, and he stated that he was "happy-go-lucky" and only becomes distressed when he is contacted by the police department. He further told her: "Every time I see on TV or read in the paper that an officer was involved in a shooting, I can relate to what that officer is going through." According to her written report, her testing revealed findings of "PTSD, in remission." She opined that "the officer does not currently meet criteria for PTSD and/or any other psychological disorder." The officer, "does, however, continue to experience extreme, highly specific anger that cause him some degree of intermittent distress, and that would likely interfere with his ability to function effectively as a police officer."

¶ 18    In her written report, she further opined that plaintiff was incapable of resuming duty where "[t]he officer's failure to resume duty as a police officer appears largely due to the fact that he is

intensely angry with the department and unwilling to return until they make changes which, he maintains, they are well aware of." She recommended treatment for his specific anger-management issues, however, she found that, even with treatment, she "[did] not foresee the Officer ever resuming work with the CPD, secondary to his intense animosity toward the department." She determined that plaintiff was unable to return to work "in any capacity." Regarding whether the disabling injury is causally related to his prior injury, she opined that his disability "does not appear causally related to the claim, but rather, to the fact that he remains intensely angry with the department for not providing requested support."

¶ 19     At the hearing, Doctor Landre testified that plaintiff was not currently experiencing symptoms of PTSD at a level that would satisfy the criteria of PTSD. During her interview with plaintiff in January of 2018, plaintiff indicated that "his only distress was related to having to…deal with the [pension board] hearings [and] at the prospect of being forced to return to work as a police officer." Plaintiff told her that he was otherwise living a normal life without psychological difficulty. She explained that plaintiff told her that he does not want to go back to work with the police department because "he's mad at them" but he would go back to work if the department put in place protections for him. She found that "if he wanted to, he could get the treatment and go back to work, but I don't believe he wants to go back to work with the police department."

¶ 20     Doctor Landre was asked a series of questions relating to whether plaintiff's current disabling condition is causally related to the act-of-duty shooting incident from February 23, 2011:

"Q. Okay. And also you opined that - - you agree with [plaintiff's] request for support is for the incident that he was involved in in '11 for the shooting, correct?

A.  Correct.

Q. And you also agree that the 2011 incident was the initial trigger of [plaintiff's] need for support and the initial trigger for his PTSD symptoms that he suffered in the past.

A. I feel like that was one of many. I feel there were a lot other incidents that contributed, but that was probably the final straw.

Q. And the other incidents, as you will say in your report, are police-related incidents, such as when he had to take dead bodies out of a house?

A. Correct.

Q. All of the incidents are police related, so wouldn't it be fair to say that but for the incident that he had at the police department, he wouldn't need treatment for PTSD?

A. Correct.

Q. And, therefore, if he wouldn't need treatment for PTSD, he wouldn't be angry at the City because there is nothing to be angry about because he didn't need the treatment?

A. Correct.

Q. Therefore, as we sit here today, the anger which he has that prevents him from working, as you say in your opinion, is directly related to the PTSD or the triggering events of 2011 and the other incidents, correct?

A. Correct."

¶ 21                                    Doctor Stevan Hobfoll

¶ 22        Doctor Stevan Hobfoll testified that he was currently the principal at Star Stress, Anxiety and Resilience Consultants, and was previously a professor and chairperson at Rush University Medical College. He initially treated plaintiff in 2012 and 2013, and then again in 2018. The record includes Doctor Hobfoll's medical records for the therapy sessions with plaintiff. Starting on May 10, 2012, plaintiff met with Doctor Hobfoll approximately three to four times per month, until

March 22, 2013. The records also show that plaintiff met with Doctor Hobfoll again in April through September of 2018. The medical records from 2018 also include Doctor Hobfoll's notes on plaintiff's treatment progress.

¶ 23    Doctor Hobfoll's "Treatment progress" notes from the April 25, 2018 visit, state:

"[Plaintiff] returned with an increase in symptoms following the shooting death of a close colleague, and the threat of having to return to police work. I suggested [his] return for treatment, but he may not as he may only be looking for my testimony on his behalf. He was clearly distraught, admitted to drinking to self-medicate and was highly upset over relationship problems that occurred with his anger and upset."

¶ 24    The progress notes from the subsequent visits in May, June, and July of 2018 show that Doctor Hobfoll found that plaintiff was working on his anger issues, feeling less anger, drinking less, and had improved his relationship with his children and his fiancé. In his September 3, 2018 report, he wrote: "No current posttraumatic stress disorder."

¶ 25    The record also includes a letter by Doctor Hobfoll, dated June 20, 2018, written in response to a request by plaintiff's counsel to review the psychological examination of plaintiff conducted by Doctor Landre in January of 2018. In that letter, Doctor Hobfoll drew "very different conclusions" than Doctor Landre. The first conclusion was that, around the time of Doctor Landre's testing, plaintiff had experienced the murder of a close friend and mentor who was a commander in the Chicago Police Department." As a result, plaintiff started to drink heavily and virtually destroyed his relationship with his fiancé. In Doctor Hobfoll's opinion, these behaviors are indicators of PTSD symptomatology and "common in persons with former PTSD who are confronted with major reminder traumas…" Secondly, Doctor Hobfoll concluded that plaintiff did

not have an "anger disorder." While finding that plaintiff "has certainly been angry with the CPD,[] this is a common reaction of officers who are having to deal with the bureaucratic system and where they feel they have not been treated well."

¶ 26    Doctor Hobfoll's third conclusion was:

> "Third, I believe the main reason [plaintiff] cannot return to police work…is that when confronted with events related to violence, shootings, and death, [plaintiff] experiences a return to an extremely distraught state during which he meets criteria for PTSD. Further, when imagining being in a situation that requires the use of a weapon, [plaintiff] becomes anxious and filled with self-doubt about his ability to protect his partner or the public. For this reason, and owing to his fear of how he may react when under such pressure, [plaintiff] is fearful that he will over- or under-react to a situation where he must draw and possibly use his weapon…"

¶ 27    He concluded that plaintiff is unable to return to police duty based upon his "former PTSD, his PTSD-evoked symptoms when confronted with this past incident concerning the murder of a fellow police officer and mentor, and his distraught response when thinking about having to be in a situation in which he had to draw and possibly use his weapon…" He also concluded that this disability is a "direct result of the PTSD he suffered following being shot in the line of duty as a Chicago Police Officer."

¶ 28    At the hearing, Doctor Hobfoll testified that he agreed with Doctor Landre's determination that plaintiff no longer met the criteria for PTSD. He also testified that he disagreed with Doctor Landre's determination that plaintiff had an "anger disorder." He found that while plaintiff gets angry at times, he has worked with plaintiff about his anger, and the doctor had never seen an

officer, under these circumstances, who is not angry with the Chicago Police Department. He also testified that plaintiff's anger symptoms are one of the symptoms of PTSD and related to his PTSD. While Doctor Landre concluded that plaintiff had "PTSD, in remission," Doctor Hobfoll testified that he would use different language. Instead, he concluded that plaintiff is "at high risk for entering back into PTSD if he was, again, exposed to situations of threat and harm." He determined that plaintiff would be at risk to lapse into PTSD if he was involved in a shooting event, if he had to draw a weapon in a tense situation, or he was a witness to such an event. When asked if plaintiff is disabled, Doctor Hobfoll testified:

"I don't think he's disabled in a - - if this was not for handling a weapon, no, I don't think [plaintiff] is disabled.

I think he's able to work, live a good life and do as well as, you know, the average guy or gal.

For the level of being able to sign for a weapon, I believe he is disabled given that criteria."

¶ 29     Doctor Hobfoll's opined that plaintiff "represents a danger to himself and others to be in a position of having a weapon and having the police powers that are subsequent to having that weapon as a police officer." His concern is that plaintiff would not only be hesitant and second-guess himself in a situation in which he would have to draw his weapon, but it would be highly likely that such an experience would lead to PTSD.

¶ 30     Doctor Hobfoll suggested that plaintiff should be brought back into duty as a police officer on a gradual basis "probably begin by going back to the academy, getting back on the shooting range, then going back to a desk-type job, then going in a car with a veteran officer who has a very good

record who's trusted with them until he was then ready for full service." He has been told that the Chicago Police Department does not have such a program.

¶ 31    The record includes documents showing plaintiff's treatment dates with Doctor Robin Kroll. The record includes Doctor Kroll's medical progress reports and other notations for Warner's treatment from July of 2012 to May of 2013. In 2013, Doctor Kroll also wrote letters to the Pension Board, to the CPD, and to the Independent Police Review Authority ("IPRA") outlining the treatment and her diagnosis. In a letter dated November 18, 2015, to the Pension Board, Doctor Kroll wrote that plaintiff had been attending PTSD police group therapy since April 10, 2012, and individual stress management training since January 2013. In a letter dated December 5, 2018, to the Pension Board, Doctor Kroll listed 52 dates of service, including 26 individual sessions and 26 PTSD/critical incident group therapy sessions. The letter listed 11 dates in 2012, 28 dates in 2013, 3 dates in 2014, 7 dates in 2015, and 2 dates in 2016, and 1 date in 2018.

¶ 32                              The Board's Decision

¶ 33    Following the conclusion of the testimony, the Board issued its written decision.[2] Specifically, the Board found:

> (1) Plaintiff was not a credible witness based upon his "misleading and evasive testimony with regard to the medical treatment…" he received since his injury.
>
> (2) Doctor Hobfoll was not a credible witness based upon his testimony regarding the lapse of time in his visits with plaintiff and his written report in which he "seemingly questioned [plaintiff]'s motive in returning to him after the five (5) year absence."

---

[2] The report is dated February 28, 2018, however, that date is incorrect as the administrative hearing was held after this date, the Board's orally announced its decision on January 31, 2019, and the certificate of mailing for the report is dated March 1, 2019.

(3) Doctor Hobfoll's testimony was confusing where he attempted to "downplay the reporting of Dr. Landre while agreeing with her assessment that [plaintiff] no longer suffered from PTSD" and where he testified that plaintiff's PTSD could be easily triggered if he was confronted with violent acts, but also "found nothing wrong with [plaintiff] frequently speaking about traumatic shooting events involving police officers on TV and talk shows."

(4) Doctor Landre's testimony was not disputed by Doctor Hobfoll and both doctors found that Warner no longer suffered from PTSD for which the Board originally awarded him a duty disability benefit. Both doctors acknowledged that plaintiff's inability to return to work "was related to his long-standing and continued anger at the CPD."

(5) "[Plaintiff], while no longer disabled by way of PTSD, the condition for which the Board initially granted [plaintiff] a 75% duty disability benefit, remains disabled and is currently unable to return to service with the CPD because of his deep-seeded and continuing anger with the CPD as to the manner in which they handle situations involving mental disabilities suffered by police officers. [Plaintiff] is therefore entitled to a disability benefit."

(6) Plaintiff's anger and animosity towards the CPD as to how the department has treated its employees "is a condition not uncommon in the workplace and is a situation common to all citizens in the ordinary walks of life, and does not entitle [plaintiff] to a duty disability benefit as defined in the Act."

¶ 34    The Board terminated plaintiff's duty disability benefits effective January 31, 2019 and granted him an ordinary disability benefit.

¶ 35                                    The Circuit Court's Decision

¶ 36        Plaintiff sought administrative review with the circuit court. Plaintiff argued that the Board's

decision was not supported by the record, and the Board misinterpreted section 5-154 of the Code,

as to what constitutes a line-of-duty disability. 40 ILCS 5/5-154 (West 2001). On July 7, 2020, the

circuit court reviewed the Board's factual findings relating to the gaps in treatment, that plaintiff

is no longer suffering from PTSD, and that plaintiff is disabled due to his anger and animosity

towards the CPD. The circuit court found that these factual findings were not against the manifest

weight of the evidence.

¶ 37        Specifically, as to the factual findings relating to the gaps in treatment, the circuit court looked

at the testimony of plaintiff, Doctor Hobfoll and Doctor Kroll, as well as the attached documentary

evidence, relating to the frequency of his treatments. The circuit court found that "the Court cannot

conclude that the Board's findings that there are gaps in [plaintiff's] treatment is against the

manifest weight of the evidence.

¶ 38        As to the Board's factual finding that plaintiff no longer suffered from PTSD, the circuit court

found that this factual finding was not against the manifest weight of the evidence. The court found

that both Doctor Hobfoll and Doctor Landre testified that plaintiff did not currently suffer from

PTSD.

¶ 39        As to the Board's factual finding that plaintiff was disabled due to "his deep-seeded and

continuing anger with the CPD[,]" the circuit court looked at Doctor Landre's testimony that

plaintiff "was not living with any symptoms of PTSD and that 'if he would deal with his anger

issues towards the [CPD], he would be capable of going back to work.'" Although the circuit court

recognized that Doctor Hobfoll testified that the tests given by Doctor Landre "were incapable of

diagnosing an anger disorder, there is some evidence supporting the Board's finding and the Court cannot second guess the Board."

¶ 40    The circuit court found that it would not overturn the Board's determination that the testimony of plaintiff and Doctor Hobfoll were not credible. The circuit court, however, further found that the Board's decision to reduce his pension from a line-of-duty disability pension to an ordinary disability pension was clearly erroneous "because Dr. Landre (the only physician who testified) testified that [plaintiff] had an anger issue and linked that anger issue directly to the February 23, 2011 incident." The circuit court relied on that portion of Doctor Landre's testimony in which he agreed with counsel's position that "the anger which he has that prevents him from working, as you say in your opinion, is directly related to the PTSD or the triggering events of 2011 and the other incidents…" The circuit court determined that plaintiff's line-of-duty pension should be reinstated retroactively to February 28, 2018.

¶ 41    On July 24, 2020, the Board filed a timely notice of appeal from the circuit court order. Accordingly, we have jurisdiction.

¶ 42                                    ANALYSIS

¶ 43    The Pension Code provides that judicial review of pension board decisions is governed under the terms of the Administrative Review Law. 40 ILCS 5/3-101 *et seq*. (West 2012); 40 ILCS 5/3-148 (West 2012). In administrative cases, the appellate court reviews the decision of the Board, not the decision of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill.2d 497, 531 (2006). "[T]he board of trustees of a police pension fund is the entity statutorily empowered to verify an applicant's disability and right to receive benefits. [Citation]" *Wade v. City of North Chicago Police Pension Board*, 226 Ill.2d 485, 513 (2007).

¶ 44    In Administrative Review Law, we may not consider new or additional evidence beyond what was originally presented to the Board, and the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 1994). It is within the Board's province to accord weight to the evidence, resolve conflicts presented by the evidence, and determine the credibility of witnesses. *Prawdzik v. Board of Trustees of Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 36. Accordingly, we defer to the Board on questions of fact unless its findings are against the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident. *Wade*, 226 Ill.2d at 504, citing *Marconi*, 225 Ill.2d at 532 (2006); *Jones v. Board of Trustees of the Police Pension Board*, 384 Ill.App.3d 1064, 1067 (4th Dist. 2008). At the same time, our deference to the Board is not without limit. *Ashmore v. Board of Trustees of Bloomington Police Pension Fund*, 2018 IL App (4th) 180196, ¶ 41. There must be competent evidence in the record to support the Board's decision. *Miller v. Board of Trustees of Oak Lawn Police Pension Fund*, 2019 IL App (1st) 172967, ¶ 40. If the record contains evidence that supports the Board's factual conclusions, then we shall not disrupt those conclusions, even if an opposite conclusion is reasonable. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill.2d 533, 538 (1997).

¶ 45    Where there is a mixed question of law and fact, we defer unless the Board's ruling is clearly erroneous. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill.2d 380, 392 (2001) (citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill.2d 191, 205 (1998)); *Wade*, 226 Ill.2d at 505 (citing *Marconi*, 225 Ill.2d at 532). This is a less deferential standard than the manifest weight of the evidence standard, yet still "significantly deferential": we will find the Board's decision "clearly erroneous" only where we are "'left with the definite and firm conviction that a mistake has been committed.'" *AFM Messenger Service*, *Inc.,* 198 Ill.2d at

395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1984)). Regardless of the standard of review, plaintiff bears the burden of proof and will be denied relief if she fails to meet that burden. *Wade*, 226 Ill.2d at 505 (citing *Marconi*, 225 Ill.2d at 532-33).

¶ 46                                                   Disability

¶ 47        As a threshold issue, the Board was tasked with determining whether plaintiff continued to be disabled. The Board found that plaintiff's disability for PTSD had ceased. The Board also found, however, that plaintiff continued to be disabled because of anger relating to "his deep-seeded and continuing anger with the CPD[.]" Because these determinations amounted to a factual finding, this Court will review them under the manifestly erroneous standard. See *Hoffman v. Oland Firefighter's Pension Bd.*, 2012 IL App (1st) 112120, ¶ 20 (manifest weight of the evidence standard applied to factual question of whether the Board's termination decision, grounded on a doctor's testimony that the plaintiff was never disabled, was proper)

¶ 48        We agree with the circuit court's determination that these factual findings were not against the manifest weight of the evidence. The Board found that both Doctor Landre and Doctor Hopfoll testified that plaintiff did not currently suffer from PTSD. In Doctor Landre's written report, she determined that her testing revealed findings of "PTSD, in remission" and further opined that plaintiff "does not currently meet criteria for PTSD…" At the hearing, she testified that plaintiff was not currently experiencing PTSD at a level that would satisfy the criteria of PTSD. Doctor Landre also testified that "by his own report, he was not experiencing those symptoms at a level that would satisfy the criteria for PTSD." While Doctor Hobfoll's opinion differed as to how to describe plaintiff's condition, he agreed that plaintiff did not meet the criteria of PTSD. Thus, this Court finds that the Board's conclusion that plaintiff's disability for PTSD had ceased was not against the manifest weight of the evidence.

¶ 49    The Board also found that plaintiff continued to be disabled because of his anger issues. The Board's decision is supported by the written report and testimony of Doctor Landre. In her written report, the doctor stated that plaintiff was unable to return to work where "[t]he officer's failure to resume duty as a police officer appears largely due to the fact that he is intensely angry with the department and unwilling to return until they make changes which, he maintain, they are well aware of." She also testified that "his anger towards the Department - - that seemed to be the main barrier to his return to work." Doctor Hobfoll's testimony slightly differed in that he acknowledged that plaintiff was angry, but he did not conclude that plaintiff's anger prevented him from returning to work. Instead, he found that plaintiff's inability to return to work was related to the lingering effects of his prior PTSD diagnosis and his concern that, when confronted with events relating to violence, shootings, and death, plaintiff "experiences a return to an extremely distraught state during which he meets criteria for PTSD."

¶ 50    It was within the purview of the Board to credit the testimony of Doctor Landre more than that of Doctor Hobfoll. We must defer to the Board's assessment of the testimony and the credibility of the witnesses. *Trettenero v. Police Pension Fund of City of Aurora*, 333 Ill.App.3d 792, 802 (2nd Dist. 2002) ("Although we agree that an individual's own medical provider can have a unique insight into his or her patient's condition, we must defer to the Board's assessment of the testimony and the credibility of the witnesses.") When faced with a conflict of evidence, "it was the Board's function, as the finder of fact, to assess the credibility of the documentary information and the testimony of the witnesses and to determine the appropriate weight to be given the evidence." *Marconi v. Chicago Heights Police Pension Bd.*, 225 Ill.2d 497, 540 (2006). "So long as the record contains evidence supporting the agency's decision, that decision should be affirmed." *Marconi*, 225 Ill.2d at 540 (citing *Commonwealth Edison Company v. Property Tax Appeal Board*, 102 Ill.2d

443, 467 (1984)). The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. *Id*. at 534; *Abrahamson v. Ill. Dept. of Professional Regulation*, 153 Ill.2d 76, 88 (1992); *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill.2d 533, 538 (1997).

¶ 51    Plaintiff argues that the Board erred when it "relied almost exclusively on the report and testimony of Doctor Nancy Landre… [and] its own lay opinion that [plaintiff] was no longer disabled because of [his] purported gaps in treatment dates." The record, however, shows that the Board relied on the findings of both Doctor Landre and Doctor Hobfoll regarding their conclusion that plaintiff no longer fit the criteria for PTSD. Moreover, the Board did not rely upon the gaps in treatment dates to support its conclusion that plaintiff's disability for PTSD had ceased. Instead, the Board looked at that evidence to support its determination that it found both plaintiff and Doctor Hobfoll to not be credible witnesses.

¶ 52    Contrary to plaintiff's argument, the Board's reference to the gaps in treatment did not amount to a "lay opinion[.]" In referencing the testimony as to whether there existed a gap of several years in which plaintiff did not seek medical treatment, the Board made a factual finding; not a lay opinion. In fact, the circuit court found that the Board's determination as to the existence of a gap in treatment was a factual finding that was not against the manifest weight of the evidence.

¶ 53    We also find that the Board's factual finding that there existed a gap in treatment dates was not against the manifest weight of the evidence. Plaintiff testified that he had been treated by Doctor Hobfoll, Doctor Kroll, and Doctor Tudor. While plaintiff testified that the longest time he had gone without seeing a therapist was a month, the records submitted to the Board did not support his claim. Starting on May 10, 2012, plaintiff met with Doctor Hobfoll approximately three to four times per month until March 22, 2013. Plaintiff met with Doctor Hobfoll again in 2018, from April

through September of 2018. In a letter to the Board, dated December 5, 2018, Doctor Kroll listed 52 dates of service, including 26 individual sessions and 26 PTSD/critical incident group therapy sessions. The letter listed eleven dates in 2012, 28 dates in 2013, three dates in 2014, seven dates in 2015, two dates in 2016, and one date in 2018. Plaintiff also testified that he was treated by Doctor Tudor one time on April 24, 2013. Thus, the record shows that for three years, from 2014 to 2106, plaintiff received treatment on twelve occasions; far short of plaintiff's representation that he had been treated only a monthly basis.

¶ 54        Plaintiff also seeks for this Court to find that his participation in the Employee Assistance Program and Chicago Police Survivors Group were part of his "treatment." There was no evidence presented as to when and how often plaintiff participated in either of these programs. Also, there was no evidence presented to show that his participation amounted to "treatment" for his disability. Therefore, plaintiff's participation in either of these programs does not support his attack on the Board's factual finding that there were gaps in plaintiff's treatment.

¶ 55        For the forementioned reasons, we find that the Board's decision that plaintiff ceased to be disabled from PTSD but continued to be disabled from his anger and animosity towards the CPD, was not manifestly erroneous.

¶ 56                                         Line-of-duty Disability

¶ 57        The Board argues that the circuit court erred when it reversed the Board's decision that plaintiff was entitled to ordinary disability and not a line-of-duty disability. The Board contends that plaintiff was not entitled to a line-of-duty disability pension where his disability was a result of anger and stress issues resulting from the way he was treated by the CPD, and this anger was not causally related to an act of duty. Relying upon the testimony of Doctor Landre as to causation,

plaintiff argues that he sustained his burden of proof in showing that he was entitled to a line-of-duty disability pension where his disability was causally related to the act of duty shooting incident.

¶ 58    "'Whether the facts, as found by the Board, satisfy the standard for awarding a line of duty disability pension' is a mixed question of law and fact subject to the clearly erroneous standard of review." *Prawdzik v. Board of Trustees of Home Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 38 (quoting *Hammond v. Firefighters Pension Fund of City of Naperville*, 369 Ill.App.3d 294, 307 (2nd Dist. 2006)); *Rose v. Board of Trustees of Mount Prospect Police Pension Fund*, 2011 IL App (1st) 102157, ¶ 69. Thus, we should affirm the Board's decision "unless we are left with definite and firm conviction that a mistake has been committed." *Prawdzik*, 2019 IL App (3d) 170024, ¶ 38 (citing *Hammond*, 369 Ill.App.3d at 307); *Carillo*, 2014 IL App (1st) 130656, ¶ 21; *Rose*, 2011 IL App (1st) 102157, ¶ 69.

¶ 59    The Code provides different pension benefits depending upon the circumstances of a police officer's incurred disability. It is well-established that a police officer does not qualify for a line-of-duty disability pension merely because the officer was injured while on duty. "Only an injury that was incurred in the performance of an act of duty could entitle [the plaintiff] to 'duty' disability…" *Summers v. Retirement Bd. Of Policemen's Annuity and Ben. Fund of City of Chicago*, 2013 IL App (1st) 121345, ¶ 10; 40 ILCS 5/5-154 (West 2010). "Act of duty" is statutorily defined as:

"Any act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances of police regulations of the city in which this Article is in effect or by a special assignment; or any act of heroism performed in the city

having for its direct purpose the saving of the life or property of a person other than the policeman." 40 ILCS 5/5-154 (West 2010).

¶ 60    To receive a line-of-duty disability, a claimant must prove that the duty-related accident "'is a causative factor contributing to the claimant's disability.'" *Rose v. Board of Trustees of Mount Prospect Police Pension Fund*, 2011 IL App (1st) 102157, ¶ 92, quoting *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 333 Ill.App.3d 543, 550 (1st Dist. 2002). However, "[n]othing in the Illinois Pension Code….requires an act of duty to be the sole cause of an officer's disability…" *Village of Franklin Park v. Sardo and the Board of Trustees of the Franklin Park Police Pension Fund*, 2020 IL App (1st) 191161, ¶ 2. Moreover, a claimant is not required to prove that a duty-related incident is even the primary cause of his disability. *Rose v. Board of Trustees of Mount Prospect Police Pension Fund*, 2011 IL App (1st) 102157, ¶ 92. If the plaintiff became disabled as the result of any cause other than an injury incurred in the performance of an act of duty, the plaintiff would be entitled to "ordinary" disability. 40 ILCS 5/5-155 (West 2010).

¶ 61    In cases involving claims of duty-related stress, the officer must prove disability resulting from "'a specific, identifiable act of duty unique to police work.'" *Village of Franklin Park*, 2020 IL App (1st) 191161, ¶40, quoting *Robbins v. Board of Trustees of the Carbondale Police Pension Fund of the City of Carbondale, Illinois*, 177 Ill.2d 533, 542 (1997). Therefore, "a line-of-duty pension is not allowed for disability resulting from "'generalized police stress of multiple origins.'" *Id*. at 40; citing *Robbins*, 177 Ill.2d at 543.

¶ 62    The Board originally granted plaintiff a line-of-duty pension because of the act of duty incident involving the shooting in which plaintiff was shot and wounded while transporting an arrestee, after which, he returned fire and killed the arrestee. Plaintiff continued to receive a line-of-duty

pension until 2018, at which time, the Board commenced its annual review of plaintiff's disability benefit and requested that plaintiff be examined by one or more physicians appointed by the Board. 40 ILCS 5/5-156 (West 1998). The Board, however, after finding that plaintiff's disability for PTSD had ceased and plaintiff was disabled because of his anger with the CPD, also found that plaintiff's disability for anger towards his employer was not a line-of-duty disability as it is "a condition not uncommon in the workplace and is a situation common to all citizens in the ordinary walks of life…"

¶ 63        We find that the Board's conclusion that plaintiff's disability was not causally related to an "act of duty" to be clearly erroneous. Upon review of the evidence, we are left with the definite and firm conviction that a mistake has been committed.

¶ 64        Doctor Landre stated in his written report:

> "The officer's disability does not appear causally related to the claim, but rather, to the fact that he remains intensely angry with the department for not providing requested support. There is, however, no evidence that the disabling injury exacerbated a prior medical condition, prior injury, or pre-existing dominant condition."

¶ 65        However, during his testimony at the hearing, Doctor Landre admitted: (1) the initial trigger for plaintiff's need for support was the 2011 incident in which he was shot; (2) if plaintiff did not need treatment for PTSD, he would not be angry at the CPD for the manner in which he was treated; and (3) "the anger which he has that prevents him from working…is directly related to the PTSD or the triggering events of 2011 and the other incidents…" Therefore, Doctor Landre contradicted her earlier conclusion and admitted during her testimony that plaintiff's anger is causally related to shooting incident in 2011.

¶ 66        Moreover, Doctor Hobfoll's testimony also supports the conclusion that plaintiff's anger is causally related to the act-of-duty shooting incident in 2011. While Doctor Hobfoll found that plaintiff did not have all the symptoms for PTSD, and plaintiff's anger symptoms do not reach the level of a disability, he specifically testified that anger is one of the symptoms or PTSD and his anger symptoms "are also related to his former PTSD…" He also concluded that the PTSD was causally related to the shooting incident in 2011. Therefore, Doctor Hobfoll's testimony supports the conclusion that plaintiff's current disability is causally related to the act-of-duty shooting incident in 2011.

¶ 67        While the source of plaintiff's anger could be, in part, from his anger because of the way the CPD treated him following the 2011 shooting incident, the evidence established that plaintiff's current disability is causally related to the 2011 shooting incident, which the Board previously found to constitute an "act of duty" incident. As previously stated, a claimant does not have to establish that the disability was solely caused or even primarily caused by the act of duty incident. Viewing the record in its entirety, we must therefore find the Board's finding that plaintiff was not entitled to a line-of-duty disability pension was clearly erroneous. This ruling, however, is based upon a unique set of facts – specifically, that both doctors determined that his anger is causally related to his prior injury of PTSD – and should not be read to allow for a plaintiff to be awarded duty disability any time there is lingering anger towards their employee.

¶ 68        As a concluding matter, plaintiff requests attorney fees under section 5-228(b) of the Code (40 ILCS 5/5-228(b) (West 2018)), which provides:

            "If any policeman whose application for either a duty disability benefit under Section 5-154 or for an occupational disease disability benefit under Section 5-154.1 has been denied by the Retirement Board brings an action for administrative

review challenging the denial of disability benefits and the policeman prevails in the action in administrative review, then the prevailing policeman shall be entitled to recover from the Fund court costs and litigation expenses, including reasonable attorney's fees, as part of the costs of the action."

¶ 69   This appeal does not involve an officer's application for duty disability benefits under section 5-154. See 40 ILCS 5/5-154 (West 2018). Rather, it involves proceedings initiated by the Board under section 5-156 to establish continuing proof of disability. See 40 ILCS 5/5-156 (West 2018). Accordingly, plaintiff's request for fees is denied.

¶ 70                                    CONCLUSION

¶ 71   For the foregoing reasons, we find the Board's determination that plaintiff had ceased to be disabled from PTSD but continued to be disabled from his anger and animosity towards the CPD, was not manifestly erroneous. We further find that the Board's finding that plaintiff was entitled to an ordinary pension and not a line-of-duty pension was clearly erroneous. Accordingly, we affirm the circuit court of Cook County's reversal of the Board's decision.

¶ 72   Affirmed.